**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| IN RE 2014 RADIOSHACK ERISA LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | ) ) ) ) ) ) ) ) ) ) MASTER FILE NO. 4:14-cv-00959-O |

**REPLY IN SUPPORT OF THE RADIOSHACK DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND TO STRIKE JURY DEMAND**

**MORGAN, LEWIS & BOCKIUS LLP**

Ellen L. Perlioni
TX ID No. 00794155
1717 Main Street, Suite 3200
Dallas, TX 75201
Phone: 214.466.4000
Fax: 214.466.4001
Email: ellen.perlioni@morganlewis.com

Brian J. Ortelere (*admitted pro hac vice*)
PA ID No. 46464
Jeremy P. Blumenfeld (*admitted pro hac vice*)
PA ID No. 90785
1701 Market Street
Philadelphia, PA 19103
Phone: 215.963.5150
Fax: 215.963.5001
Email: bortelere@morganlewis.com

Matthew A. Russell (*admitted pro hac vice*)
IL ID No. 6290632
77 W. Wacker Drive
Chicago, IL 60601
Phone: 312.324.1771
Fax: 312.324.1001
Email: marussell@morganlewis.com

*Counsel for Defendants RadioShack 401(k) Plan Admin. Committee, RadioShack Puerto Rico Plan Admin. Committee, and the Individual Defendants*

Plaintiffs' Opposition to the Defendants' Motion to Dismiss (Dkt. 177, "Opposition") continues the same "kitchen sink" approach to this case reflected by the 400+ scattershot allegations in their Second Amended Complaint ("SAC") (Dkt. 167). Plaintiffs cannot overcome the fundamental deficiencies that led this Court to dismiss their complaint the last time around.

**I.     The Court Need Not Consider Plaintiffs' New "Inside Information" Allegations.**

Plaintiffs' Opposition admits they seek to inject an entirely "new 'inside information' claim" into this lawsuit, and that they rely on the "identical facts" underlying that claim in arguing that *nonpublic* information can constitute a "special circumstance" for purposes of their *public-*information claim under the Supreme Court's ruling in *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459 (2014). (Opp. at 1, 5.) The Court does not even need to reach these arguments, which stray well beyond its January 25, 2016 Order (Dkt. 153) and, regardless, have been waived.

*First*, plaintiffs' Opposition effectively concedes the SAC goes beyond this Court's Order, which granted them a second chance "to allege any special circumstances that existed in regards to RadioShack's stock price and the market's reliance on that price." (Dkt. 153 at 21.) Plaintiffs also do not dispute that the "special circumstances" requirement applies only to a claim based on public information. (*See* Dkt. 172 ("Mot.") at 9-11.) Plaintiffs' only response is that their new claim is "based on the identical facts comprising the 'special circumstances' allegations." (Opp. at 5.) While that may be (only underscoring why such inside information cannot support a *public-*information claim at all), the fact that plaintiffs base both theories on "identical facts" does not mean this Court authorized them to add entirely new *claims*. It did not.

*Second*, plaintiffs offer no meaningful response to Defendants' waiver argument. Time and time again over the fourteen months before the Court granted Defendants' motion to dismiss, plaintiffs reiterated, through *three* complaints, that their claims were premised on public information alone. (Dkts. 1, 39, 66.) Their only ostensible justification for waiting until February 2016 to add their new allegations is that they rely primarily on a separate complaint filed in the

Bankruptcy Court.[1]  (Opp. at 6.)  But even if that Complaint revealed any "new" information (it did not), plaintiffs knew of it no later than September 4, 2015, and now suggest they have been using the past five months to "investigate" the allegations.[2]

Plaintiffs' purported need for such a lengthy investigation is betrayed by their own conduct. Counsel for Defendants was informed by counsel for the RSH Liquidating Trustee on *March 24, 2016*—just four days before plaintiffs filed their Opposition—that plaintiffs had only recently inquired about obtaining relevant documents from the Liquidating Trustee.  (Appx. 1, B. Ortelere Decl. ¶ 4.)  Moreover, it was *plaintiffs* who, more than a year ago in March 2015, specifically negotiated an agreement in RadioShack's bankruptcy proceeding with the debtor and eventually the Liquidating Trustee to preserve relevant documents.[3]  Plaintiffs indisputably could have—and should have—sought the same information they now claim to have needed all along.

More importantly, during this supposed five-month "investigation," not once did plaintiffs inform either Defendants or the Court of the possible need to reopen the pleadings to accommodate the "[n]ew facts" they supposedly "discovered" back in September 2014.[4]  (Opp. at 6.)  Instead, plaintiffs repeatedly confirmed to the Court they were pursuing only a public-information claim and allowed all parties to fully brief a motion to dismiss (at not insignificant cost) (Dkts. 110-113), sought to amend the scheduling order without raising the potential need to reopen the pleadings (Dkts. 106, 108, 151), moved for class certification of their public-information claims only (Dkt.

---

[1] *See* Dkt. 8, *RSH Liquid. Trust v. Magnacca*, No. 4:15-ap-04076 (Bankr. N.D. Tex.) ("UCC Complaint").

[2] Plaintiffs claim to have discovered these "[n]ew facts" on October 29, 2015, when the RSH Liquidating Trust filed its Amended Complaint. (Opp. at 6.)  This is demonstrably false.  As noted before, plaintiffs' counsel forwarded the *original* UCC Complaint—filed on August 31, 2015—to Defendants' counsel on September 4 (*see* Mot. at 9), and there is no material difference in the underlying allegations in both UCC Complaints.  *Compare RSH Liquid. Trust*, Dkt. 1, *with* Dkt. 8.  In fact, in seeking a stay of this case after this Court granted Defendants' prior motion to dismiss, plaintiffs represented to the Court that they intended to rely on the allegations of the *original* UCC Complaint filed on August 31.  (Dkt. 161 at 3.)

[3] *See* Dkt. 8-1 at 5 ¶ 6, *In re: RadioShack Corp.*, Adv. Pro. No. 15-50181 (BLS) (Bankr. D. Del. March 17, 2015); *Id.* Dkt. 12 at 4 ¶ 4 (May 26, 2015); *see also* Dkt. 3067 at 35-36, *In re RS Legacy Corp.*, No. 15-10197 (BLS) (Bankr. D. Del. Oct. 2, 2015) (agreeing that the Liquidating Trust's document preservation obligations survive the final Plan of Liquidation).

[4] A timeline of plaintiffs' representations since the UCC Complaint was filed is attached as Appx. 3-5.

114), and—most strikingly—*settled* this matter with the Trustee Defendants based solely upon the previous operative complaint (Dkts. 125, 149).  Indeed, plaintiffs sought this Court's approval for a Class Notice, Settlement Agreement, and Final Approval Order, each predicated upon a final settlement of these claims, not once noting or informing putative class members of any potential new claims.  Against this backdrop, the only plausible explanation for plaintiffs' change in position is that they made the strategic decision to proceed with a public-information claim, and only now seek to reverse course because this Court rejected that theory.

*Third*, for the same reasons, plaintiffs cannot show good cause under Rule 16(b) to now add a new "inside-information" claim.  *See* Fed. R. Civ. P. 16(b)(4); *S&W Enters., LLC v. Southtrust Bank of Ala., N.A.*, 315 F.3d 533, 536 (5th Cir. 2003) (relevant factors include the reason for not timely moving and the potential prejudice in allowing the amendment).  Plaintiffs' contention that "Defendants can claim no prejudice" is false.  Defendants investigated plaintiffs' public-information allegations; engaged in written discovery and meet-and-confers; deposed the named plaintiffs; fully briefed one motion to dismiss (and have now completed a second); engaged in formal mediation; and performed other litigation activity in defending against the public-information claim.  *See id.* at 536-37 (finding prejudice because plaintiff "would assert a different cause of action," meaning defendant "would be required to conduct additional discovery").  For any of these reasons, the Court should disregard plaintiffs' new inside-information allegations.

## II.     Plaintiffs Misstate Applicable Law And Mischaracterize *Dudenhoeffer*.

Plaintiffs continue to argue as though the Supreme Court's ruling in *Dudenhoeffer* says something other than it actually does, complaining that this Court's reading of that ruling—which is consistent with almost every other court to consider these issues—would result in onerous pleading standards and conflict with the principle that all ERISA fiduciaries are subject to the same duty of care. (Opp. at 10.)  However, plaintiffs' arguments confuse the *application* of ERISA's fiduciary standard with the standard itself.  The applicable standard is undisputed:  a

fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). But this standard necessarily contemplates that different conduct will be "prudent" depending upon the circumstances. The pertinent question, then, is how this standard *applies* in the context of a plan that requires offering participants the option of investing in employer stock.

*Dudenhoeffer* squarely answered that question. Although the Court found nothing in ERISA to support presuming prudent behavior, it then immediately emphasized that a motion to dismiss is an "important mechanism for weeding out meritless claims" and set forth precisely how a plaintiff must *prove* a fiduciary breach in the specific context of a plan's investment in employer stock. 134 S. Ct. at 2470-71. The Court articulated two specific and *different* requirements for stating a plausible "imprudence" claim depending on the nature of the breach alleged. In doing so, the Court acknowledged that although the *standard* remains the same, what is deemed prudent with respect to employer stock is different than for a discretionary decision concerning other types of plan investments. Thus, plaintiffs' incessant comparison to fiduciary decision-making involving non-employer-stock investments—*e.g.*, mutual funds, "junk bonds," corporate debt, or mortgage-backed securities—and their reliance on cases like *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015), are misplaced.[5]  (*See* Opp. at 3-4, 10 n.19.)

*Second*, plaintiffs also are wrong in asserting that "[c]learly, the Supreme Court meant to lessen the pleading burden that had been imposed by a presumption of prudence" under pre-existing law. (Opp. at 12.) Far from being "clear," the Supreme Court's opinion does just the opposite by *raising* the pleading standard, something multiple authorities have recognized.[6]

---

[5] Numerous courts have rejected reliance on *Tibble* on this basis, including most recently the Second Circuit. *See Rinehart v. Lehman Bros.*, 2016 WL 1077009, at *4 n.3 (2d Cir. Mar. 18, 2016); *Coburn v. Evercore Trust Co., N.A.*, 2016 WL 632180, at *7 (D.D.C. Feb. 17, 2016).

[6] *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 113 F. Supp. 3d 745, 755 (S.D.N.Y. 2015), *aff'd sub nom. Rinehart*, 2016 WL 1077009 ("*Dudenhoeffer* appears to have *raised* the bar for plaintiffs seeking to

4

### III. Plaintiffs Do Not State A Plausible Public-Information Claim.

Plaintiffs' Opposition adds nothing new concerning the SAC's allegations that Defendants should have acted based solely upon public information and only confirms they can identify no "special circumstance affecting the reliability of [RadioShack's] market price." *Dudenhoeffer*, 134 S. Ct. at 2472.  Like their previous complaints, the SAC's extensive allegations about how swiftly the market reacted to a deluge of public information render implausible any claim of an inefficient market or unreliable stock price.  (*See* Mot. at 11-17.)

*First*, plaintiffs offer no legitimate explanation for why simply re-labeling allegedly undisclosed *inside* information can constitute a "special circumstance" for a *public*-information claim.  As outlined in Defendants' Motion (at 9-10), plaintiffs' position would turn *Dudenhoeffer* on its head by merging the two distinct claims and rendering the Court's analysis of a separate inside-information claim superfluous.  Indeed, Defendants have located no decision after *Dudenhoeffer* permitting a plaintiff to shoehorn material inside information into a "special circumstance" for a public-information claim, and plaintiffs cite none.[7]

Plaintiffs' only response is that if undisclosed inside information renders a stock "artificially inflated," a fiduciary could be liable *regardless* of whether they "themselves possess" or even know that information.  (Opp. at 9.)  This makes no sense.  ERISA's prudence standard is not a strict liability statute, and plaintiffs cite no support for holding a fiduciary liable

---

bring a claim based on a breach of the duty of prudence.") (quotations omitted); *In re UBS ERISA Litig.*, 2014 WL 4812387, at *8 n.11 (S.D.N.Y. Sept. 29, 2014), *aff'd sub nom. Taveras v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015) (same); *cf. Harris v. Amgen, Inc.*, 788 F.3d 916, 927-28 (9th Cir. 2015) (Kozinski, J., dissenting), *rev'd* 136 S. Ct. 758 (2016) (per curiam) (noting that the Supreme Court required "a rigorous 12(b)(6) inquiry," "crafted new and daunting liability requirements that plaintiffs must plausibly allege are met in order to state a claim," and "plainly intended to offer fiduciaries robust protection against litigation at the motion to dismiss stage").

[7] To the contrary, multiple courts have addressed complaints raising both public- and inside-information claims and analyzed them separately.  *See, e.g.*, *Lehman Bros.*, 2016 WL 1077009, at *4-6; Appx. 10-18, *Saumer v. Cliffs Natural Res. Inc.*, No. 1:15-cv-954-DAP, Dkt. 44 (N.D. Ohio April 1, 2016); *In re BP p.l.c. Secs. Litig.*, 2015 WL 1781727, at *8-17 (S.D. Tex. Mar. 4, 2015), *on appeal at Whitely v. BP, p.l.c.*, No. 15-20282 (5th Cir.) (finding "no coherent theory as to why the market's valuation of BP *based on public information* was unreliable – i.e., why the market for BP ADSs was inefficient," while at the same time *denying* motion to dismiss inside-information claims) (emphasis added).

for failing to act upon information he or she never even had. To the contrary, *Dudenhoeffer* established the "special circumstances" exception strictly in the context of allegations that a fiduciary "*should have recognized from publicly available information alone* that the market was over- or undervaluing the stock." 134 S. Ct. at 2471 (emphasis added).[8] If a fiduciary in fact knows of material inside information causing the stock to be "artificially inflated," then plaintiffs must satisfy *Dudenhoeffer*'s inside-information pleading requirements.[9]

*Second*, plaintiffs' other alleged "special circumstances" had no impact on the reliability of RadioShack's stock price and thus are not "special" under *Dudenhoeffer*. For example, that the bond and derivative markets and other "market indicators predicted RadioShack would default" is all part of the mixture of available public information, and plaintiffs offer no reason why these predictions were not incorporated into the market price.[10] Plaintiffs' reliance on RadioShack's "excessive debt load"—also public—fails for the same reason. Indeed, it is hard to imagine any major corporate bankruptcy not involving significant debt preceding a default, one of the reasons most companies enter bankruptcy in the first place.

*Third*, plaintiffs incorrectly argue that Defendants' alleged failure to investigate the prudence of RadioShack stock is itself a "special circumstance." (Opp. at 17-18.) Among other things, the extent to which Defendants monitored RadioShack stock had *no* impact on the "reliability of the market price," meaning it is not a "special circumstance" by definition. The

---

[8] *See also* 134 S. Ct. at 2471 ("ERISA fiduciaries, who likewise could reasonably see little hope of outperforming the market . . . based *solely on their analysis of publicly available information*, may, as a general matter, likewise prudently rely on the market price.").

[9] Plaintiffs' Opposition concedes that the "separate question of whether it is imprudent to continue investing in company stock that a fiduciary *has reason to believe is overvalued* based on material information he or she possesses is addressed by the non-public information claim." (Opp. at 9 (emphasis added).) But that is precisely the point: if the fiduciary has no reason to believe a stock's price is unreliable based on public information alone, then any belief to that effect based on inside information must be analyzed separately under *Dudenhoeffer*.

[10] The Second Circuit recently rejected a similar argument in *Lehman Bros.*, finding plaintiffs failed to plausibly allege a public-information claim despite "updated descriptions" of market conditions, including "rising costs of Lehman credit default swaps and other investment instruments." 2016 WL 1077009, at *4.

whole point of *Dudenhoeffer* is that absent some reason to believe the market price is unreliable, a fiduciary "may, as a general rule, prudently rely" upon that price as an unbiased assessment of its value, thereby assuring the fiduciary that participants are not paying too much for the investment. (*See* Mot. at 9-12.) Regardless, plaintiffs offer nothing but unsupported conclusions of an imprudent "process," which are implausible as a matter of law.

## IV. Plaintiffs Do Not State A Plausible Inside-Information Claim.

Even if the Court considers plaintiffs' belated inside-information claim, their Opposition does nothing to cure the fundamental deficiencies rendering it implausible. (*See* Mot. at 17-24.)

*First*, the Court need not even consider the *Dudenhoeffer* pleading requirements because plaintiffs still do not sufficiently identify *any* actual material inside information. Rather, the Opposition continues to use broad, generic allegations that do not specify *what* information was withheld, *who* had that information, *when* that person acquired it, or, most importantly, *how* that information would have altered the market's overall assessment of RadioShack's value. Unable to surpass the threshold requirement that they actually identify material nonpublic information, the remainder of plaintiffs' insider-information claim fails. *See, e.g.*, Appx. 18, *Saumer*, slip op. at 13 ("[W]hile Plaintiffs assert that Defendants acted imprudently based on inside information, they never actually allege what that information *was*.").

*Second*, even if some material information existed, plaintiffs are not specific about which Defendants purportedly had it or when. Indeed, they concede that no Committee Defendant— the individuals with actual day-to-day control over the Plans' investments—had any material undisclosed information.[11] (Opp. at 23.) Instead, plaintiffs argue that the Committee failed to investigate RadioShack's executives and *uncover* the alleged nonpublic information. (*Id.*) But the SAC does not allege that an investigation would have "revealed to a reasonable fiduciary that the investment at issue was improvident," and "includes no specific allegations about what lines

---

[11] *See , e.g.*, *BP*, 2015 WL 1781727, at *12-13 (complaint "must include specific allegations" of knowledge for each defendant supposedly possessing alleged inside information).

7

of inquiry would have revealed this information or who, if pressed, in fact would have disclosed it to the Plan Committee Defendants." *Lehman Bros.*, 2016 WL 1077009, at *5 (quotations omitted).[12] And the Director Defendants, serving solely as appointing and monitoring fiduciaries, were under no affirmative duty to inform the Committee of nonpublic information unrelated to the Plans. *See id.* at *6 ("ERISA does not impose a duty on appointing fiduciaries to keep their appointees apprised of nonpublic information.") (quotations omitted).

*Third*, plaintiffs' purported reliance on the UCC Complaint gets them no further. Nowhere in the SAC do plaintiffs allege that the federal securities laws required Defendants to disclose any of the "inside information" they now cite, and the UCC Complaint makes no such allegation either. Rather, the Liquidating Trust alleges that certain RadioShack executives breached their *corporate* fiduciary duties by waiting too long to enter bankruptcy, not because they affirmatively misled the public or violated securities laws. Even the authorities plaintiffs cite acknowledge that an ERISA fiduciary is under no *greater* obligation to disclose inside information than required by securities laws, *see, e.g.*, *Murray v. Invacare Corp.*, 125 F. Supp. 3d 660, 669-70 (N.D. Ohio 2015), and plaintiffs point to no securities law violation here.[13]

*Fourth*, and relatedly, plaintiffs have not plausibly alleged that any of the amorphous "inside information" upon which they rely was material or proximately caused any economic loss. Defendants' opening Motion outlined why the SAC conclusively demonstrates that the

---

[12] There is a "significant difference" between allegations that a fiduciary failed to act on nonpublic information *available to them* as insiders (as in *Dudenhoeffer*), and claims "that the Plan Committee Defendants breached their fiduciary duty by failing to pursue insider information held by *others*." *Lehman Bros.*, 113 F. Supp. 3d at 761. In the latter situation, "plaintiffs must be able to allege with specificity how a hypothetical investigation would have elucidated risks allegedly known only to corporate insiders or otherwise would have alleviated the purported harm to ESOP beneficiaries caused by the alleged breach." *Id.* at 762.

[13] Moreover, plaintiffs' wholesale incorporation of the UCC Complaint's allegations—which currently are subject to a pending motion to dismiss, *see* Dkt. 18, No. 15-ap-04076 (Bankr. N.D. Tex. Nov. 12, 2015)—is an insufficient basis to plausibly allege an inside-information claim. *See Texas Water Supply Co. v. Reconstruction Finance Corp.*, 204 F.2d 190, 196-97 (5th Cir. 1953); *accord Constellation Energy Commodities Group Inc. v. Transfield ER Capital Ltd.*, 801 F. Supp. 2d 211, 223 (S.D.N.Y. 2011) ("A pleading may not adopt other pleadings from a wholly separate action.").

inside information they allege was not "material" under securities laws. (Mot. at 12-15, 22-23.) In short, the SAC itself describes the market's ongoing assessment of the very same information they claim was withheld—that RadioShack had little to no chance of a "turnaround"—over the same period they claim the stock was "artificially inflated." *See, e.g.*, Appx. 21, *Saumer*, slip op. at 16 (rejecting claims of material misrepresentation in light of the "exceptional amount of negative information available to the public"). Plaintiffs offer no meaningful response, nor can they, arguing only that had this supposed "inside information" been disclosed sooner, the drop in the stock price may have been lower. This is rank speculation that, in any event, is belied by the absence of *any* allegations about a material impact on the stock's price upon full disclosure.[14]

Further, in light of the Committee's decision to freeze the Company Stock Fund on July 11, 2014, plaintiffs do not even plausibly allege the Plans actually purchased any RadioShack stock at an "artificially inflated" price. The UCC Complaint upon which the SAC relies focuses primarily on events occurring after the "summer of 2014," in particular a transaction with Standard General that closed in October 2014. (SAC ¶ 285.) But plaintiffs ignore that the Committee Defendants already acted on July 11, 2014 to freeze the Company Stock Fund, effective as soon as administratively possible on September 15, 2014, meaning the Plans purchased no additional "artificially inflated" shares after that date. (*See* Mot. at 4-5.)

*Fifth*, plaintiffs still have not articulated viable alternative actions Defendants should have taken that would have been consistent with federal securities laws. (*See* Mot. at 18-20.) They argue (at 18-19) that Defendants could have frozen the Company Stock Fund to new investments—which they did. Plaintiffs claim Defendants could have disclosed the supposedly

---

[14] In fact, plaintiffs do not even allege that the supposedly material information *was* disclosed publicly, much less when. Thus, plaintiffs also fail to allege loss causation for an "artificial inflation" claim under the Supreme Court's ruling in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), which courts apply to ERISA "artificial inflation" claims like these. *See Murray*, 125 F. Supp. 3d at 669-70 (citing *Metyk v. KeyCorp*, 560 F. App'x 540, 542-43 (6th Cir. 2014)). Stock prices might drop for any number of reasons, and to state a claim that a misrepresentation proximately caused economic loss requires alleging one "bought stock at a price inflated by misrepresentations, but that the market later learned the truth, causing 'the share price [to] f[a]ll significantly.'" *Id.* at 670 (quoting *Dura*, 544 U.S. at 346-47).

9

material inside information to the public themselves, yet do not explain why such disclosure would have been required by securities laws, and ERISA fiduciaries cannot be held to a higher disclosure standard than their corporate counterparts.[15] Conceding that the Committee had no inside information, plaintiffs' only explanation of why engaging an independent fiduciary would have mattered is that it "could have helped them overcome their self-interest"—yet they point to no "self-interest" impacting any Defendant's fiduciary decision-making here. (Opp. at 20.)

Nor have plaintiffs plausibly alleged that a prudent fiduciary *could not have* concluded that freezing the Stock Fund sooner or disclosing a hunch that RadioShack's CEO's public statements were overly optimistic "would do more harm than good." *Amgen*, 136 S. Ct. at 760 (quotations omitted). Indeed, plaintiffs make this allegation as far back as November 2011, when the stock was trading at $11/share, and throughout a multi-year period when RadioShack was fighting for survival. A prudent fiduciary could have concluded taking such drastic actions "could have had dire consequences." *Lehman Bros.*, 2016 WL 1077009, at *6. Plaintiffs also continue to misstate the standard. The question is not whether freezing the Stock Fund sooner in fact "*would not have* done more harm than good" in hindsight (Opp. at 20 (emphasis added)), but rather whether "a prudent fiduciary in the defendant's position *could not have*" come to that conclusion. *Dudenhoeffer*, 134 S. Ct. at 2473. Plaintiffs do not plausibly allege this here.

For these reasons and those outlined in Defendants opening Motion, the Court should dismiss each of plaintiffs' claims with prejudice.

---

[15] Judge Kozinski's dissent in *Amgen* articulates why this result would be untenable: "Under conditions of uncertainty, the only way a fiduciary can avoid the risk of liability is by disclosing any *arguable* violation" of federal securities laws. 788 F.3d at 926. However, the fiduciary might disagree with the corporate officials about what needs to be disclosed, when it should be disclosed, or other similar issues; "[s]uch differences of opinion are a common occurrence in most corporations. A fiduciary—often a mid-level administrator with no independent legal counsel and limited information about the company's overall situation—may well be egregiously wrong in his assessment." *Id.* It would be absurd to impose a requirement under ERISA for such an individual to publicly disclose such suppositions when securities law does not require it, which could "have disastrous consequences for the share price." *Id.*

|  |  |
|---|---|
| Dated:  April 11, 2016 | Respectfully Submitted, |
|  | */s/  Matthew A. Russell* |
|  | **MORGAN, LEWIS & BOCKIUS LLP** |
| Brian T. Ortelere (*admitted pro hac vice*)<br>Jeremy P. Blumenfeld (*admitted pro hac vice*)<br>1701 Market Street<br>Philadelphia, PA 19103<br>Phone:  215.963.5258<br>Fax:  215.963.5001<br>Email:   bortelere@morganlewis.com<br>            jblumenfeld@morganlewis.com | Ellen L. Perlioni<br>1717 Main Street, Suite 3200<br>Dallas, TX 75201<br>Phone:  214.466.4000<br>Fax:  214.466.4001<br>Email:  ellen.perlioni@morganlewis.com<br><br>Matthew A. Russell (*admitted pro hac vice*)<br>77 W. Wacker Drive<br>Chicago, IL 60601<br>Phone:  312.324.1771<br>Fax:  312.324.1001<br>Email:  marussell@morganlewis.com<br><br>*Counsel for Defendants RadioShack 401(k) Plan Admin. Committee, RadioShack Puerto Rico Plan Admin. Committee, and the Individual Defendants.* |

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 11, 2016, I filed the foregoing document using the Court's CM/ECF system, which will serve a copy of this document to all registered CM/ECF participants.

        /s/ *Matthew A. Russell*
        Matthew A. Russell