IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

|  |  |
|---|---|
| IN RE 2014 RADIOSHACK ERISA LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MASTER FILE NO. 4:14-cv-00959-O |

**NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF THE RADIOSHACK DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AND TO STRIKE JURY DEMAND**

The RadioShack Defendants[1] hereby submit this Notice of Supplemental Authority in support of their Motion to Dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint. Dkts. 171, 179. On August 19, 2016, United States Magistrate Judge Roy S. Payne of the United States District Court for the Eastern District of Texas issued a Report and Recommendation that recommended the dismissal of all claims for breach of fiduciary duty under ERISA in lawsuit involving a retirement plan's investment in company stock. *See* Dkt. 196, *In re Pilgrim's Pride Stock Investment Plan ERISA Litigation*, No. 2:08-cv-472-JRG-RSP (Aug. 19, 2016) (attached hereto as Exhibit 1). Magistrate Judge Payne's Report and Recommendation supports the dismissal of Plaintiffs' claims in this case for the reasons set forth in the RadioShack Defendants' Motion to Dismiss.

---

[1] Specifically, the RadioShack 401(k) Plan Administrative Committee, the RadioShack Puerto Rico 1165(e) Plan Administrative Committee, James F. Gooch, Joseph C. Magnacca, Robert E. Abernathy, Frank J. Belatti, Julia A. Dobson, Daniel A. Feehan, H. Eugene Lockhart, Jack L. Messman, Thomas G. Plaskell, Edwina D. Woodbury, Mark Barfield, Karina Davis, Eric Hales, Justin Johnson, Michael Keyser, Kevin Krautkramer, Martin Moad, and Sri Reddy.

Dated:  September 9, 2016

Respectfully Submitted,

*/s/  Matthew A. Russell*

**MORGAN, LEWIS & BOCKIUS LLP**

Brian T. Ortelere (*admitted pro hac vice*)
Jeremy P. Blumenfeld (*admitted pro hac vice*)
1701 Market Street
Philadelphia, PA 19103
Phone:  215.963.5258
Fax:  215.963.5001
Email:   bortelere@morganlewis.com
             jblumenfeld@morganlewis.com

Matthew A. Russell (*admitted pro hac vice*)
77 W. Wacker Drive
Chicago, IL 60601
Phone:  312.324.1771
Fax:  312.324.1001
Email:  marussell@morganlewis.com

*Counsel for Defendants RadioShack 401(k) Plan Admin. Committee, RadioShack Puerto Rico Plan Admin. Committee, and the Individual Defendants.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 9, 2016, I filed the foregoing document using the Court's CM/ECF system, which will serve a copy of this document to all registered CM/ECF participants.

      /s/ *Matthew A. Russell*
Matthew A. Russell

# EXHIBIT 1

APP000004

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| IN RE PILGRIM'S PRIDE STOCK INVESTMENT PLAN ERISA LITIGATION § § § § § | Case No. 2:08-cv-472-JRG-RSP |

## REPORT AND RECOMMENDATION

Currently before the Court is the Defendants' Motion for Judgment on the Pleadings (Dkt. No. 152). The motion came on for hearing on January 26, 2016. Following the review of all briefing and the record, the Court concludes that the motion should be granted.

This case is a putative class action on behalf of the approximately 16,000 participants in the Pilgrim's Pride Retirement Savings Plan who owned company stock in the Plan during the period from January 29, 2008 to December 1, 2008. Defendants are the Directors and Officers of Pilgrim's Pride and the members of its Compensation Committee, Pension Committee and Administrative Committee. They are all alleged to be fiduciaries who exercised control over the Retirement Savings Plan.

Plaintiffs allege that Pilgrim's Pride was in dire financial straits at the beginning of 2008 as a result of poor financial decisions by management. They allege that the stock, trading around $25 per share at the beginning of 2008, was grossly overvalued because the stock market was not aware of these financial problems. The Defendants, as corporate insiders, are all alleged to have known of these problems. Defendants are also alleged to have had strong financial or employment-related interests in keeping the problems from becoming publicly known in order to avoid personal or professional ruin. Defendants are also alleged to have been trying in early 2008 to complete an offering of Pilgrim's Pride stock to raise $180 million to save the company. Not only would public discovery of the company's true financial condition endanger the stock

1

offering, some of the Defendants are alleged to have promised the underwriter not to sell any other company stock (such as that held by the Plan), in violation of their asserted fiduciary duties to the Plan.

Plaintiffs acknowledge that disclosure of the adverse financial information would have decreased the stock price, but contend that by allowing the sale of the stock in the Plan it would have done more good than harm for the Plan participants. Plaintiffs allege that Defendants had at least four alternative courses of action which, if taken, would have avoided the financial losses incurred by the Plaintiffs.

First, the Plan is alleged to have held 1.16 million shares of Pilgrim's Pride stock at the beginning of the class period on January 29, 2008, then trading at $23.83 per share, for a total value of about $30 million. Plaintiffs allege that, "even with any drop in the price," a prudent fiduciary could not have concluded that disclosing the true condition and selling the stock would do more harm than good to the Plan.

Second, Plaintiffs allege that instead of disclosing and selling, Defendants could have "transferred" the Plan's assets into other investment options in the Plan, such as cash. Third, the Defendants could all have resigned as fiduciaries and relinquished management of the Plan to independent fiduciaries. Plaintiffs allege that such independent fiduciaries would have been free to sell without concern for insider-trading laws, but they do not explain why the new fiduciaries would have wanted to sell the Plan's stock if they did not know of the company's poor condition. Fourth, the Defendants could have sought guidance from the Department of Labor or the SEC, which would have allegedly counseled resignation, leading to the option discussed above.

*Analysis*

Plaintiffs assert three claims against the Defendants, all involving alleged breaches of fiduciary duty:  (I) failure to prudently and loyally manage the plans and assets of the Plans; (II) failure to monitor fiduciaries; and (III) co-fiduciary liability.  Counts II and III are asserted against certain subgroups of the Defendants and depend upon the viability of Count I.  Thus, the Court will focus on Count I.

The Supreme Court has provided significant guidance on the issues presented by these claims since this suit was filed.  In 2014, the Court decided *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. ___, 134 S.Ct. 2459 (2014), in which a putative class of employees claimed that the fiduciaries of the defendant's retirement plan (an ESOP) violated their duties of loyalty and prudence by allowing the Plan to remain invested in company stock when the fiduciaries (all company insiders) should have known based on both public and non-public information that the stock was grossly overvalued and would soon collapse.  The Court held that the fiduciaries of an ESOP have the same duty of prudence and loyalty as the fiduciaries of other retirement plans, except that they have no duty to diversify the holdings of the plan.  However, the Court held that, absent "special circumstances affecting the reliability of the market price," allegations that a fiduciary should have recognized the overvaluation of the stock based on publicly available information are "implausible."  *Id*. at 2471.  Allegations based on non-public information are also problematic, due to the legal prohibition on insider trading.

> "To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it."

*Id*. at 2472.  The Court concluded with an admonition to the lower courts to "consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases—which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment—or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." *Id*. at 2473.  The Court re-emphasized the importance of this last admonition earlier this year in *Amgen Inc. v. Harris*, 577 U.S. ___, 136 S.Ct. 758 (2016).   The question is not whether a reasonable fiduciary could have concluded that divesting the company stock would be prudent.  The question is whether no reasonable fiduciary could have concluded that divesting would do more harm than good.

Count I is based on the fiduciaries' failure to properly consider both publicly available information and non-public, insider information.  The public information includes Pilgrim's having taken on excessive debt, related primarily to the purchase of Gold Kist (a former competitor), which left the company vulnerable to the effects of negative cash flow.  That cash flow problem is alleged to have resulted from simultaneous decreases in both poultry demand and poultry prices, and increases in fuel costs and feed costs.  Also alleged are bad decisions on hedging positions taken regarding the corn supply.

Plaintiffs argue that they have alleged the sort of "special circumstances" required by *Fifth Third* because the risk profile of the company stock exceeded the reasonable bounds for a retirement option and there was a threat of impending bankruptcy.  Nothing in the Supreme Court's opinion supports the argument that these allegations are the sort of special circumstances alluded to.  First, the Court described the allegations before it as involving the failure of the fiduciaries to react when the company stock became "excessively risky" resulting in the loss of

74% of the value of the Plan. That set of facts is not sufficiently different from the instant case to justify a belief that there are special circumstances here. To the extent that Plaintiffs rely on Defendants' alleged possession of adverse insider information, that could not be the special circumstance missing in *Fifth Third*, since the Court noted the allegation there that Fifth Third had "deceived the market" leading to overvaluation. *Id*. at 2464. Second, the Court described the special circumstances as "affecting the reliability of the market price as 'an unbiased assessment of the security's value in light of all public information,' … that would make reliance on the market's valuation imprudent." *Id*. at 2472. None of Plaintiffs' allegations plausibly explain how the market would not be able to reliably digest and reflect the sort of information alleged. Indeed, the real thrust of the Plaintiffs' allegations is that the critical information was concealed by the Defendants and not available to the Plaintiffs or the market.

With respect to the non-public, insider information, Plaintiffs seek to satisfy the requirement of *Fifth Third* that they "plausibly allege an alternative action" that the fiduciaries could have taken that is both consistent with the securities law prohibition on insider trading and that a prudent fiduciary "could not have concluded … would do more harm than good." The first alternative proposed is that the Defendants could have publicly disclosed all of the adverse financial information that Plaintiffs allege caused the stock price to be seriously inflated, which would then have allowed Defendants to sell the Plaintiffs' company stock. What renders this allegation implausible is that a reasonable fiduciary could clearly have concluded that the bankruptcy of the company was not inevitable. Demand could increase, or fuel and feed costs could decrease, or the company could succeed in raising the additional capital needed to weather the storm. Publicizing all of the negative insider information alleged by Plaintiffs would

guarantee the collapse of the company stock, as Plaintiffs actually allege.[1] Innumerable things could have happened to avoid the collapse, and it is simply implausible to say that a reasonable fiduciary could *not* have concluded that accelerating a stock collapse would cause more harm than good. The argument that the harm of the earlier collapse would be offset by the fact that ongoing purchases would be cheaper is also unpersuasive. The million-plus shares already in the Plan dwarf the small number that would have been added in any given month by contributions to the Plan.

The implausibility of this alternative is demonstrated by Plaintiffs' own pleadings. When the company did disclose publicly on September 24, 2008 the existence of its hedged grain positions (just one of the negative financial conditions alleged to be inflating the stock price), the stock price immediately dropped by 40%. (Dkt. No. 58 at ¶175). Plaintiffs alleged other, more serious, non-public financial information, such as the "debilitating debt load" brought on by the overpayment for Gold Kist in a $1.1 billion hostile takeover, and the and the improper claim of $505 million in goodwill as a result of the acquisition. (Dkt. No. 58, ¶¶106-108, 111-115). Plaintiffs assert that even as late as September 24, 2008, when the stock was at $10.26, it still "continued to trade at inflated levels." (Dkt. No. 181 at p. 4). Thus, the above disclosure of badly hedged grain positions, and the concomitant 40% drop, was just part of what a full disclosure would have caused.[2]

---

[1] "Pilgrim's Pride was plagued by undisclosed but pervasive problems that infected every part of the Company's business and which when ultimately disclosed, drove the Company into bankruptcy protection." (Dkt. No. 58 at ¶6).

[2] This case is easily distinguished from the scenario addressed by the Department of Labor in its brief in another matter, filed into the record by Plaintiffs. (Dkt. No. 191-1). There the DOL was addressing the allegations in the BP Stock Fund litigation concerning whether the Fund's fiduciaries acted imprudently by offering the Fund to employees as an investment option when they knew BP had fraudulently misrepresented its safety improvements and risk of accidents. There was no allegation that stock value would collapse upon disclosure.

- 6 -

APP000010

The second proposed alternative is that Defendants could have "transferred" the company stock into other plan investments or into cash and suspended further investments in company stock. Plaintiffs do not allege how a transfer is different than a sale of the stock and the Court cannot perceive the difference. Furthermore, simply terminating the Plaintiffs' option to invest in company stock would likely have signaled the market.[3] Plaintiffs allege that when the company finally suspended the employees' ability to invest in company stock on October 16, 2008, the stock price immediately plunged another 23.5%. (Dkt. No. 58 at ¶181). Again, it cannot plausibly be alleged that these alternatives could not have reasonably been deemed to risk more harm than good.

The third proposed alternative course of action is that the Defendants could have resigned as fiduciaries and retained outside experts to serve either as advisors or as independent fiduciaries. This would allow the new fiduciaries to sell the company stock held by the Plan, without violating the restrictions on insider trading. What is missing from this alleged alternative is any indication as to why the new fiduciaries would want to sell off the stock if all they knew was the same public information available to the market, information already reflected in the price of the stock. Without an accompanying disclosure of the adverse financial information, and its attendant market consequences, this alternative would accomplish nothing toward avoiding the harm complained of by Plaintiffs.

The fourth proposed alternative is that Defendants should have sought guidance from the Department of Labor or the Securities and Exchange Commission. Plaintiffs allege that the agencies would have advised the Defendants to resign and implement the third alternative,

---

[3] According to a brief prepared by the SEC in another matter and filed into this record by Plaintiffs, the insider trading laws require that the suspension of purchases of company stock by ESOP fiduciaries be promptly accompanied by the accurate disclosure of the reasons for the suspension. (Dkt. No. 191-2 at p.6).

discussed above. Neither facts nor authority are cited in support of this bare conclusion, and in any event it suffers from the same defects as that alternative.

The last issue presented by this record involves the argument that Plaintiffs have a claim based on breach of the duty of loyalty that can survive dismissal of the claims based on the duty of prudence. The Supreme Court limited its holding in *Fifth Third* to "the duty-of-prudence claims." 134 S.Ct. at 2464. Plaintiffs have alleged that Defendants breached their duty of loyalty by failing to take the steps discussed above. Plaintiffs emphasize that Defendants all either owned stock in Pilgrim's Pride or were employed by it, or both. They also allege that certain key defendants had personal guarantees for Pilgrim's Pride debt and that Defendants agreed to a Lock-Up agreement, preventing them from selling the company stock in the Plan, as part of the $180 million stock offering in mid-2008 designed to raise capital to stave off bankruptcy. These facts are alleged to show that Defendants had self-interests in conflict with those of the Plaintiffs thus violating their fiduciary obligation of loyalty to the Plan and its participants.

If merely possessing interests in conflict with the Plan were sufficient to constitute an actionable breach of the duty of loyalty, then no ESOP could have fiduciaries who have management responsibility in the company. Company management must often take actions that do not maximize the stock price, especially in the short term. See, *In re Bear Stearns Companies, Inc. Securities, Derivative, and ERISA Litigation*, 763 F.Supp.2d 423 (S.D.N.Y. 2011). Rather, it is necessary for the Plaintiffs to allege that the Defendants, acting in their capacity as the Plan fiduciaries, took some action that was contrary to the Plaintiffs' interests but in furtherance of their own interests and caused harm to the Plan. Plaintiffs cite no authority for the proposition that the sort of conflicts of interest alleged here turn acts that don't breach the

duty of prudence into actionable events. After all, in *Fifth Third,* the Court explained that it was alleged that corporate insiders had made material misstatements that they were concealing from the market and continued to use the Plan's money to buy company stock at inflated prices. Surely the Court did not lay down the detailed requirements for pleading a breach of the duty of prudence if all that was required was to label the insufficient allegations as a breach of the duty of loyalty.

The Lock-Up agreement alleged to be part of the stock offering for additional capital cannot plausibly be alleged to be an act by the Defendants in their capacities as Plan fiduciaries. The Supreme Court has made clear that corporate management decisions are not part of the fiduciary acts of retirement plan trustees. "At common law, fiduciary duties characteristically attach to decisions about managing assets and distributing property to beneficiaries." *Pegram v. Herdrich*, 530 U.S. 211, 231, 120 S.Ct. 2143, 2155 (2000). The Court went on to hold that mixed eligibility and treatment decisions made by the defendant HMO, acting through its physicians, were not fiduciary acts within the meaning of ERISA. Similarly, the Fifth Circuit has held that "a person is a fiduciary only 'to the extent' he has or exercises specified authority, discretion, or control over a plan or its assets*." Kirschbaum v. Reliant Energy, Inc*., 526 F.3d 243, 251 (5th Cir. 2008).

*Conclusion*

For the foregoing reasons, the Court finds that Plaintiffs have not stated a viable claim against Defendants and that any further pleading by Plaintiffs would be futile. Accordingly,

IT IS RECOMMENDED that the Motion for Judgment on the Pleadings (Dkt. No. 152) be GRANTED and that this action be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the findings, conclusions, and recommendations contained in this report within fourteen days after being served with a copy shall bar that party from de novo review by the district judge of those findings, conclusions, and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings, and legal conclusions accepted and adopted by the district court. Fed. R. Civ. P. 72(b)(2); see *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 19th day of August, 2016.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE